**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

AFFIDAVIT OF SPECIAL AGENT MICHELE NEILY, FBI

IN RE:  CRIMINAL COMPLAINT for Valeria Ventura Ramirez,

I, the undersigned, being duly sworn do hereby depose and say the following:

1.      I am an investigative or law enforcement officer of the United States,

within the meaning of Section 2510(7) of Title 18, United States Code, and am

empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18, United States Code.  I have been a Special

Agent with the Federal Bureau of Investigation (hereinafter "FBI") since May of

1997.  I attended New Agent training at the FBI Academy in Quantico, Virginia.

Subsequently, I completed additional training in telecommunication techniques,

money laundering, financial investigation, search warrants, and specific training

pertaining to Title III Wire Intercepts.  I have been assigned to several field

divisions where I worked organized crime and drug investigations for 18 years.

Since 2010, I have been assigned to the Omaha Division of the FBI. Specifically, I

am assigned to the FBI Safe Streets Task Force in Omaha, NE, charged with

investigating organized criminal enterprises involved in large-scale smuggling,

distribution, and sale of illegal drugs.  In conducting my official duties, I have

authored affidavits in support of search warrants, criminal complaints, and for the

court ordered authorization to intercept wire communications.  I have participated

in controlled substance investigations of alleged criminal violations of the

Controlled Substances Act laws.  I have participated in investigations involving the

purchase of controlled substances from suspected narcotics traffickers using both

undercover operatives and confidential sources.  I have participated in investigations involving the wire interception of conversations pursuant to Title III. I have participated in the execution of search warrants for controlled substances, the proceeds, and documentary evidence of drug trafficking.  I have conducted surveillance in connection with drug investigations.  Through the course of these investigations, I have personally interviewed confidential sources and persons arrested for the distribution of illegal drugs and money laundering violations.  My training and experience as a Special Agent, my participation in the investigation of drug trafficking organizations, my conversations with known drug traffickers, and my conversations with other law enforcement officials familiar with drug trafficking and money laundering, form the basis of my opinions and conclusions set forth below which I drew from the facts set forth herein.  I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of controlled substances and the collection of monetary proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.  I have conducted investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) and Title 18, United States Code, Sections 1956 & 1957, and related offenses.

2.      I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation, and, in part, based upon information from the following sources:

a.  Oral and written reports about this investigation and others I have received from other Special Agents and other law enforcement officers, agents and agencies in the United States;

b.  Physical surveillance conducted by federal agents or local law enforcement agents, which observations have been reported to me either directly or indirectly;

c.  Summaries of consensually recorded telephone calls and other consensually obtained wire communications or court ordered wire communications intercepts, which have been reported to your affiant either directly or indirectly; and

d.  A review of statements of cooperating sources and cooperating defendants.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and warrant and does not set forth all of my knowledge about this matter.

## FACTS SUPPORTING PROBABLE CAUSE

### A.  Money Services Businesses (MSB)

4.      NOVEDADES VENTURA, INC, (SUBJECT PREMISES 2) is a money service business (MSB) that provides money transfer services within the United States, Mexico and Central America.  The main destination of funds transferred by

SUBJECT PREMISES 2, is Mexico.  In order to conduct money transfers from the

United States to Mexico, VENTURA used/uses parent MSBs such as MoneyGram,

Western Union, Sigue, InterCambio Express, CES and Intermex.  VENTURA, using

SUBJECT PREMISES 2, acted as an agent for these companies.  MSB's pay

NOVEDADES VENTURA, INC. a commission for each money transfer which can

range from 20% to 50% of the $8-10 fee charged to the customer for a money

transfer.  The process for sending the money transfers generally follows the same

pattern for each parent MSB.  The individual agent acting on behalf of the parent

MSB collects the money transfer information and cash to fund the money transfer

from the customer.  The individual agent inputs this information into the parent

MSB's money transfer application or secure internet site using the individual

agent's computer.  The individual agent deposits the cash collected from the

customer for the money transfer into the parent MSB's bank account or into a bank

account that is swept, or funds withdrawn, by the parent MSB in order to collect the

funds for the money transfer.

**B.  Bank Secrecy Act (BSA)**

5.      The Financial Recordkeeping and Reporting of Currency and Foreign

Transactions Act of 1970 (31 U.S.C. 5311) is referred to as the Bank Secrecy Act

(BSA).   The BSA was enacted by Congress in 1970 to fight money laundering and

other financial crimes.  The BSA requires financial institutions to create "paper

trails" by keeping records and filing reports on certain transactions.  These reports

are submitted to the U.S. Department of the Treasury's Financial Crimes

Enforcement Network (FINCEN).  The BSA's reporting and recordkeeping

provisions apply to banks, savings and loans, credit unions, money service

businesses (MSBs) and other financial institutions.

      6.    The BSA requires MSBs to establish an Anti-Money Laundering

(AML) compliance program, file currency transaction reports (CTR) if a cash

transaction with the same customer involves more than $10,000 in cash, and keep a

record of the money transfers of $3,000 or more conducted by the same customer

regardless of the method of payment.  If a money transfer is $3,000 or more, the

MSB must obtain and record specific information about the transaction to include

verifying the customer's identification and recording customer and transaction

information.  The BSA requires the MSB to keep these records for five years from

the date of the transaction.  The BSA applies to SUBJECT PREMISES 2.

      7.    Parent MSBs, such as Western Union and Moneygram, often place

more stringent customer identification requirements on their agents such as

SUBJECT PREMISES 2, in which their agents are required to obtain customer

identifications or obtain customer identification information for money transfers

most commonly exceeding $1,000, cut sometimes the limit is up to $2,000, by the

same customer.  If a money transfer is under $1,000, or the minimum threshold set

by the parent MSB, no identification is required for the transaction.

      8.    In my training and experience, I am aware that drug traffickers and

money launderers often send money transfers under the $1,000 and $3,000 amount

thresholds to avoid having to produce or provide identification information for

money transfers in an attempt to conceal and disguise the source and ownership of the illegal proceeds used to fund the money transfers, to circumvent BSA requirements and to facilitate money laundering.

## C.  SUBJECT PREMISES 2 Owner and Operator Information

9.      I obtained business license information for SUBJECT PREMISES 2 from the Nebraska Secretary of State's Office.    NOVEDADES VENTURA, INC was registered with the State on May 6, 2010.   VENTURA was listed as the President, Secretary and Treasurer for SUBJECT PREMISES 2.

10.      On May 11, 2010, NOVEDADES VENTURA INC. registered and was accepted as a MSB with FICEN.  The MSB registration listed VENTURA as the President of NOVEDADES VENTURA, INC.

## D.  Bank Secrecy Act (BSA) Training - VENTURA

11.      The BSA and MSBs require agents to complete BSA training.  This training usually includes recognizing suspicious activity, identifying suspicious activity and structured transactions, recordkeeping and reporting requirements and verifying customer identification.  VENTURA has completed BSA training for SUBJECT PREMISES 2 on numerous occasions.

12.      On December 15, 2014, VENTURA signed the latest Master Trust Agreement (MTA) between NOVEDADES VENTURA INC. and MoneyGram Payment Systems, Inc.   VENTURA was listed as President of NOVEDADES VENTURA, INC.  General terms of the agreement indicate each party shall comply with applicable law. Applicable law is defined in the agreement as any U.S. federal, state, local or other law or statute and any rule or regulation issued by a Regulatory

Body, including the Financial Crimes Enforcement Network and the Office of

Foreign Assets Control of the United States Treasury. VENTURA also certified in

the MTA that NOVEDADES VENTURA is in compliance with, and will be during

the term of the MTA, maintain it compliance with all relevant requirements of

Applicable Law relating to anti-money laundering (AML) and the MoneyGram

Compliance Policies.  The AML requirements specifically include the Bank Secrecy

Act.

      13.    In the agreement VENTURA agreed she understood the Company is

committed to preventing the use by anyone of the Company's products and services,

including the Services, for fraudulent, abusive or illegal purposes.  Ventura

acknowledged that the company has developed, and will continue to develop,

various policies, procedures and requirements designed to limit, prevent and deter

such fraudulent or abusive transactions.

      14.    On January 15, 2015, VENTURA signed a MoneyGram document

entitled "Agent Regulatory Acknowledgements".   In the document VENTURA

certified that NOVEDADES VENTURA, INC. "adopts the policies and procedures

contained in the MoneyGram International Anti-money Laundering Compliance

Program".  She also certified that the business had received a copy of the Agent

Compliance Training Resource form MoneyGram International which provides

valuable insight to prevention of money laundering, terrorist financing, and

consumer Fraud.

15.    VENTURA signed a "Western Union Compliance Acknowledgement" and listed herself as owner and compliance officer for SUBJECT PREMISES 2. The Western Union Acknowledgement stated that if VENTURA was accepted as an agent of Western Union, VENTURA would be responsible for establishing a compliance program to monitor, track, and ensure compliance with the US Patriot Act 0f 2001, the Bank Secrecy Act and/or Western Union policy including the following: "identifying and reporting transactions and/or a series of transactions by a single consumer in a single day that amount to $2,000 or more and are suspicious; insuring that proper identification and information is recorded on same day money transfer sales to any individual totaling $3,000 or more: and meeting record retention requirements."   VENTURA did become an agent for Western Union and used Western Union to send money transfers to Mexico.

16.    On September 8, 2016, VENTURA signed the InterCambio Express Agency Agreement for SUBJECT PREMISES 2.  Under this agreement VENTURA acknowledged receiving AML training as well as agreeing that she has read the InterCambio Express compliance manual.  On the application VENTURA lists herself as President of NOVEDADES VENTURA INC.   VENTURA also warranted in the agreement that she is the designated person whom will be responsible for the Agency's BSA and Anti-Money laundering program.   The InterCambio Agreement also indicated that if VENTURA was accepted to do business as an agent of InterCambio Express, VENTURA would agree to read the InterCambio Express, Inc compliance manual, undergo compliance training, and effectively enforce

responsibilities stated in the compliance manual against money laundering and all other illegal activities affecting the agency and/or InterCambio, Express, Inc. VENTURA did become an agent for InterCambio Express, Inc. and used InterCambio Express to send money transfers to Mexico.

17.    As stated above, VENTURA had extensive training in anti-money laundering laws and the BSA.  The following sections detail how VENTURA willfully disregarded anti-money laundering laws and the BSA and how she used her knowledge of these subjects to circumvent BSA requirements and facilitate money laundering for drug traffickers.

### E.  Investigation of Alberto Hernandez DTO and connections to SUBJECT PREMISES 2

18.    In April 2015, a confidential source (hereinafter "CS-1") began providing information to law enforcement on HERNANDEZ and the HERNANDEZ DTO.  CS-1 had purchased ounce quantities of methamphetamine from HERNANDEZ in the past (approximately 2009 until February of 2015) and HERNANDEZ had recently contacted CS-1 and asked if CS-1 wanted to purchase methamphetamine.  At the direction of law enforcement, CS-1 made controlled purchases of methamphetamine between April of 2015 and September 2016 with HERNANDEZ and Celestino MENDOZA (hereinafter "MENDOZA").  MENDOZA was HERNANDEZ's lieutenant who worked at HERNANDEZ's body shop, A and R Auto on a daily basis for the purpose of assisting HERNANDEZ distribute large amounts of methamphetamine.

19.     CS-1 completed the controlled buys on the following dates:  On April

13, 2015, 114.5 grams of methamphetamine was purchased from HERNANDEZ, On

May 5, 2015, 85.3 was purchased from HERNANDEZ, On January 28, 2016, 109

grams of suspected methamphetamine was purchased from HERNANDEZ, On May

13, 2016, 114 grams of suspected methamphetamine was purchased from

HERNANDEZ, On August 3, 2016, 30 grams of suspected cocaine was purchased

from MENDOZA, On August 16, 2016, 124.75 of suspected methamphetamine was

purchased from HERNANDEZ, On August 25, 2016, 49.5 grams of suspected

cocaine was purchased from MENDOZA; and On September 23, 2016, 121.5 grams

of suspected methamphetamine was purchased from HERNANDEZ and 29.5 grams

of suspected cocaine was purchased from MENDOZA.

20.     On July 20, 2016, HERNANDEZ provided the phone number of 712-

326-7071 (hereinafter "TARGET TELEPHONE") to CS-1 and told CS-1 to begin

contacting HERNANDEZ on TARGET TELEPHONE for drug trafficking purposes.

21.     A federal application for an order authorizing the interception of wire

and electronic communications for TARGET TELEPHONE, utilized by

HERNANDEZ and referenced below, was signed by Chief United States District

Judge John A. Jarvey in the Southern District of Iowa on September 16, 2016.  A

federal application for an order authorizing continued interception of wire and

electronic communications for TARGET TELEPHONE, utilized by HERNANDEZ

and referenced below, was signed by Chief United States District Judge John A.

Jarvey in the Southern District of Iowa on October 14, 2016.   Interceptions expired

on November 12, 2016.  Summaries of interceptions believed to be criminal in

nature and pertinent to the investigation are referred to herein as "session" followed

by an identifying number.

22.     The wire intercepts assisted in identifying numerous individuals

involved in the HERNANDEZ DTO to include many of HERNANDEZ's suppliers

and distributors.  One of those suppliers identified thru wire intercepts was Isaura

Sanchez-GARCIA and Miguel Aguirre ESPARZA.

23.     On September 28, 2016, (session 3455), HERNANDEZ called

MENDOZA (712-326-6208).  Some of this conversation was in Spanish.  It should be

noted that all Spanish conversations referenced herein were translated by federally

certified linguist.  They greet each other and have some small talk.  MENDOZA

then told HERNANDEZ that he "sold everything last night to Jessie in one

transaction."  MENDOZA told HERNANDEZ that he sold "12 ounces" to Jessie last

night.  MENDOZA told HERNANDEZ that was all he could get because he was

running low.  HERNANDEZ asked if he "should call the lady."   MENDOZA replied

"If that's what you want to do." Approximately 10 minutes later, (session 3463),

HERNANDEZ called Isaura Sanchez-GARCIA (hereinafter "GARCIA") at 402-238-

8677.  This conversation was in Spanish. HERNANDEZ asked if she could "go to the

shop with the cousin" because HERNANDEZ is still in the hospital.  HERNANDEZ

said he was waiting on "3 tires and paint" she was going to give him.  GARCIA

replied "3, 3 tires and paint, right?"  HERNANDEZ said "Yes" and that he "needs to

fix everything."  HERNANDEZ then asked GARCIA if she remembers "where it is?"

GARCIA said she will call if she cannot find it.  Approximately 1 minute later,
(session 3464) HERNANDEZ called MENDOZA (712-326-6208).  This call was in
English and Spanish.  They greet.  HERNANDEZ said "She is going to come see
you.  She has a red car."  MENDOZA asked if he should only give her the "5."
HERNANDEZ said "Yes, give her 6 or if you have 7 give her 7.  MENDOZA said
"Ok, I can give her 67."Approximately 2 hours later, (session 3483), HERNANDEZ
called GARCIA.  GARCIA told HERNANDEZ that she is outside.  Not even 1
minute later, (session 3484), HERNANDEZ called MENDOZA (712-326-6208).
HERNANDEZ told MENDOZA "She is outside." At this time GARCIA was observed
at A an R Auto.  Affiant believes that HERNANDEZ asked GARCIA to bring him 3
pounds of methamphetamine and some cocaine or marijuana (paint).  Affiant
further believes that GARCIA came to A and R Auto and picked up at least $6,700
from MENDOZA.

24.     Approximately 40 minutes later, (session 3492), HERNANDEZ called
GARCIA (402-238-8677).  This call was in Spanish. GARCIA told HERNANDEZ
that she had to "bring it over there."  HERNANDEZ said that he has "the rest".
HERNANDEZ asked GARCIA to confirm that it will be done and GARCIA confirms.
Approximately 5 hours later, (session 3591), GARCIA (402-238-8677) called
HERNANDEZ.  This conversation was in Spanish.  GARCIA told HERNANDEZ
that she was going to buy pills for a toothache at the Walgreens. They agree to meet
in 20 minutes. Approximately 45 minutes later, (session 3618), GARCIA called
HERNANDEZ.  HERNANDEZ told GARCIA he left the Walgreens because there

were a lot of cars.  HERNANDEZ told her that he was parked on a side road at the

corner of 19th.  GARCIA told him to wait there and she will come and meet him.

Affiant believes that GARCIA had the 3 pounds of methamphetamine and some

other drug (possibly cocaine or marijuana) and that GARCIA met HERNANDEZ to

collect the rest of the money for the drugs and to give the drugs to HERNANDEZ.

The meeting was not observed as surveillance was set to observe the meeting at the

Walgreens and by the time the calls were translated and the new meet spot was

discovered, the meeting was over.

25.    On October 16, 2016, GARCIA (402-238-8677) called HERNANDEZ

(session 8229).  This call was in Spanish. They greet each other.  HERNANDEZ

then asked GARCIA "What was that? What are you doing, what are you doing?"

GARCIA replied "Here, I'm with my kids." HERNANDEZ said "Oh." GARCIA states

"I'm on the phone." HERNANDEZ asked "What was that?"  GARCIA replied "I'm

with my, I said I'm with the kids.  I'm going to take them, I want to take them but I

only have $20."  HERNANDEZ asked "Where are you right now?"  GARCIA

responded "On 13th, at the McDonalds on 13th.  HERNANDEZ said "Okay, right

now, I'll go over there right now."  GARCIA said "Okay."   Approximately 15

minutes later, HERNANDEZ was observed meeting with GARCIA in the parking

lot of the McDonalds on 13th Street in Omaha, Nebraska.  Later that same day, CS-

1 reported that CS-1 accompanied HERNANDEZ to the McDonalds on 13th Street in

Omaha, Nebraska. On the way to the meeting, HERNANDEZ told CS-1 that

HERNANDEZ was meeting one of his suppliers to give her (his supplier) money (an

unknown amount of cash) and that his supplier is supposed to provide him with 2 pounds of methamphetamine later in the day. CS-1 reported that CS-1 did not stay in the vehicle while HERNANDEZ met his supplier but CS-1 did observe an unknown Hispanic female driving a vehicle registered to GARCIA meet with HERNANDEZ. Affiant believes that HERNANDEZ was meeting GARCIA at the McDonald's to provide GARCIA with drug proceeds so that HERNANDEZ could get 2 pounds of methamphetamine at a later time/date.

26. An Indictment was returned in the Southern District of Iowa on November 21, 2016, charging multiple individuals, including HERNANDEZ, GARCIA, MENDOZA and Juan Martinez Gabriel FELIX (hereinafter "FELIX"), among others, with Conspiracy to Distribute a Controlled Substance, being at least 50 grams of actual and 500 grams of a mixture or substance containing methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). A cooperating defendant (hereinafter "CD-1") was one of those individuals indicted and CD-1 was arrested on November 22, 2016 on federal drug trafficking charges involving the HERNANDEZ DTO. CD-1 stated that HERNANDEZ was indeed getting pound quantities of methamphetamine from GARCIA for several months prior to CD-1's arrest. CD-1 also confirmed the conversation discussed in paragraphs 26 and 27 was a drug transaction and the conversation discussed in paragraph 28 was HERNANDEZ giving GARCIA $10,000 in drug proceeds.

27.     Another cooperating defendant (hereinafter "CD-2") was another
individual charged in the indictment referenced in paragraph 29 was also arrested
on November 22, 2016 on federal drug trafficking charges involving the
HERNANDEZ DTO.  CD-2 stated that HERNANDEZ was indeed getting pound
quantities of methamphetamine from GARCIA for several months prior to CD-2's
arrest.  CD-2 also confirmed the conversation discussed in paragraphs 26 and 27
was a drug transaction and the conversation discussed in paragraph 28 was
HERNANDEZ giving GARCIA $10,000 in drug proceeds.

28.     CD-2, under a proffer agreement, stated that in approximately August
of 2016, GARCIA asked HERNANDEZ for some money owed to GARCIA's husband
from a past drug debt. HERNANDEZ told GARCIA that he would give GARCIA
money if GARCIA would sell HERNANDEZ drugs. GARCIA had recently met Jesus
SARABIA (Hereineafter "SARABIA") and knew that SARABIA was a drug dealer.
GARCIA asked SARABIA for some methamphetamine to sell to HERNANDEZ.
SARABIA gave GARCIA a "ball" of methamphetamine and told GARCIA to charge
HERNANDEZ $6,000 or $7,500.  GARCIA gave those drugs to HERNANDEZ and
HERNANDEZ paid GARCIA $6,000 approximately 2-3 weeks later.  SARABIA then
directed GARCIA to keep $500 and bring the rest to VENTURA at SUBJCET
PREMISES 2. GARCIA brought the money to VENTURA at SUBJECT PREMISES
2.  SARABIA met GARCIA at SUBJECT PREMISES 2 and provided VENTURA 5
receiver names for VENTURA to use to send the drug proceeds back to Mexico.
SARBIA told VENTURA that he would be back later to pick up the wire transfer

receipts and that he would have more money for VENTRUA to wire to Mexico at that time.

29.     CD-2 further stated that in September of 2016, HERNADEZ asked GARCIA for more methamphetamine. GARCIA then asked SARABIA for more methamphetamine.  SARABIA told GARCIA to meet an unknown young Hispanic male in the ally behind SUBJECT PREMISES 2.  GARCIA did so and the unknown male gave her 2 pounds of methamphetamine.  SARABIA told GARCIA to charge HERNANDEZ $10,000 for the drugs. Approximately 2 weeks later, GARCIA picked up $10,000 in drug proceeds from HERNANDEZ.  SARABIA then directed GARCIA to keep $800 and bring the rest to VENTURA at SUBJCET PREMISES 2. GARCIA brought the money to VENTURA at SUBJECT PREMISES 2.  SARABIA met GARCIA at SUBJCET PREMISES 2 and provided VENTURA multiple receiver names for VENTURA to use to send the drug proceeds back to Mexico.  SARBIA told VENTURA that he would be back later to pick up the wire transfer receipts and that he would have more money for VENTURA to wire to Mexico at that time.

30.     CD-2 reported that on one occasion, GARCIA saw SARABIA with a large stack of wire transfer receipts from Ventura Market. On another occasion GARCIA was with SARABIA when he went to SUBJCET PREMISES 2 to purchase shrimp.  Inside the bag of shrimp was a thick stack of wire transfer receipts. GARCIA saw 2 of those receipts and the sender/receiver names on the receipts appeared to be related as they shared the same last name.  CD-2 stated that SARABIA was wiring the drug proceeds to Culiacan and other small towns in

Sinaloa Mexico.  VENTURA told GARCIA that she wires $10,000 of drug proceeds a

day for SARABIA.  CD-2 stated that shortly after the second drug deal between

SARABIA and GARCIA, SARABIA told GARCIA that he was being followed by law

enforcement and that he was going to Mexico.  SARABIA told GARCIA to get her

kids and flee to Mexico.

31.     CD-2 further reported that VENTURA told CD-2 that VENTURA

takes "dirty" money and wires it in small increments to Mexico.  VENTURA charges

$30-$60 per wire transfer and VENTURA tries to makes up the sender names but

tries to make them appear to be a relative of the receiver in order to avoid any

suspicion.  VENTURA only wired the "dirty" money in small increment $1,000 to

$1,500).  CD-2 reported that VENTURA also told GARCIA that VENTURA also

takes "dirty" money in $10 and $20 denominations and returns the money in $100

denominations.  VENTURA charges $500 for this service.  CD-2 also reported that

VENTURA told GARCIA if GARCIA knew anyone that may be in need of this

service to send them to VENTURA. Finally, CD-2 reported that while in SUBJCET

PREMISES 2, GARCIA observed unknown Hispanic males bring large amounts of

cash and give it to VENTURA.

32.     In June of 2017, a cooperating source (hereinafter "CS-2") reported

that CS-2 met Gabriel MARTINEZ-Cisneros (hereinafter "MARTINEZ") in 2016.

On multiple occasions while at MARTINEZ's residence, CS-2 observed large

amounts of U.S. currency being counted.  From conversations CS-2 overheard, CS-2

understood that the money being counted was drug proceeds.  In October of 2016,

MARTINEZ went to Mexico to visit his family.  Shortly after he left, MARTINEZ

contacted CS-2 and asked CS-2 to go to SUBJECT PREMISES 2 and meet with

VENTURA.  MARTINEZ told CS-2 that VENTURA had $5,000 that needed to be

wired to MARTINEZ in Mexico.  MARTINEZ told CS-2 to give VENTURA the name

of Yeseli LOPEZ Hernandez to VENTURA. MARTINEZ told CS-2 to tell VENTURA

to keep $50, to give CS-2 $200 and wire the rest of the money to Yeseli LOPEZ

Hernandez.  At the direction of law enforcement, CS-2 did as MARTINEZ directed.

VENTURA wired $1,500 and gave CS-2 $200 and a wire receipt for $1,500 with a

sender name of Joel Ariel LOPEZ Hernandez and a receiver name of Yeseli LOPEZ

Hernandez.  In December of 2016 or January of 2017, MARTINEZ contacted CS-2

and told CS-2 that an unknown individual was going to bring CS-2 $30,000.

MARTINEZ wanted CS-2 to take the money to VENTURA to be wired to Mexico.

Law enforcement directed CS-2 to tell MARTINEZ CS-2 was not willing to accept

the $30,000.  CS-2 did so and is unaware if the $30,000 was taken to VENTURA

and/or wired to Mexico.  CS-2 never knew MARTINEZ to have a job. In the summer

of 2016, MARTINEZ told CS-2 that he was trying to again illegally enter the United

States but was caught and sent back to Mexico.

        33.    In October of 2017, CD-2 told law enforcement that a cooperating

source (hereinafter "CS-3") is trusted by VENTURA and that CS-3 would be in a

position to ask VENTURA to wire drug proceeds to Mexico.  Law enforcement then

interviewed CS-3.  CS-3, not at the direction of law enforcement, recently went to

SUBJECT PREMISES 2.  CS-3 was at SUBJECT PREMISES 2 for the purpose of

wiring a portion of his/her wages to his/her family in Mexico. While at SUBJECT
PREMISES 2, VENTURA asked CS-3 about GARCIA.  CS-3 told VENTURA that
GARCIA was deported back to Mexico.  VENTURA was relieved and told the CS-3
that she was so happy that GARCIA did not talk to law enforcement about
VENTURA and that VENTURA had been very afraid that GARCIA was going to
tell law enforcement about VENTURA wiring drug proceeds to Mexico for GARCIA.
VENTURA also told CS-3 that she was scared because "Chola" had recently told her
that 1.7 million dollars of cocaine was seized in Wichita, Kansas in September of
2017.  The cocaine was bound for Omaha.  "Chola" told VENTURA that he and
other members of the DTO were fleeing to Mexico until "things calmed down."
VENTURA told CS-3 that she wired drug proceeds to Mexico for "Chola" and that
again she was worried that someone may talk to law enforcement about her
involvement in wire drug proceeds to Mexico.

34.    On November 20, 2017 at the direction of law enforcement, CS-3 went
to SUBJECT PREMISES 2 and had a conversation with VENTURA about wiring
drug proceeds to Mexico.  This meeting was recorded and the conversation was
Spanish.  CS-3 asked VENTURA "Are you here alone? You're alone? Oh, no well
look.  You know, right now I just got a job with some guys from over there in
Reynosa. That's right.  But, the guys want, uh, they want to send money over there.
Yeah." VENTURA replied "Mm-hm". CS-3 said "Come over here because you're,
you're very far over there."  VENTURA stated "No, there's no one there." CS-3
asked "There's no one? You're sure?" VENTURA replied "Well, just me."  CS-3 said

"Right."  VENTURA said "And {UI}?" CS-3 replied "No, no, no, no they are

trustworthy.  Well, I moved two or three jobs with them there." VENTURA asked

"And are they snitches?" CS-3 said "No, no, no, uh."  VENTURA asked "Where do

they send it over here? Mexico?" CS-3 replied "No, the guys send it over here to

Mexico."  VENTURA asked "But where?"  CS3- replied "To, to, I think to

Matamoros."  Later in the conversation, CS-3 said "Uh, uh but what I want to know

is – I mean, what, because they're telling me it's something."  VENTURA replied

"Mm-hm."  CS-3 stated "They've been wanting to send a load without an account.

And-and I want to know, well, more or less how much you would take or how much

is the – you understand?"  VENTURA replied "The thing is Tamaulipas and

Reynosa are blocked.  It's $500, I think, the most you can send."  CS-3 said "oh, no

way?"  VENTURA said "Yes."  CS-3 said "Oh." VENTURA said "Like for example, if

it were to Campeche we could send up to 1900." CS-3 asked "up to 1,900?"

VENTURA replied "Up to 1,900 to Campeche, but to Culiacan, $400."  CS-3 asked

"Yeah, because to, to, to Sinaloa, it's – it's worse, right?"  VENTURA replied "You

can only send $400."  Later in the conversation, VENTURA stated "They told me,

"Valeria, don't send to Culiacan anymore." And why? "Because now they are

reporting from there to here." Get this, if – if from here you send – you come and

you send a – a thousand, Isaura comes and sends 1,000, someone else comes and

sends 1,000 and they are reporting, from Ventura store, they sent X amount."  They

have further discussion about how it's become difficult to wire money to Mexico

because of the current limit amounts and reporting.

35.     Later in the conversation, VENTURA asked "Do you think $1,000 is worth it when they can take everything from me? [UI] and when they take everything from you [UI] money... You can't have a house in your name. You can't have a car in your name. You can't have a bank account. You can't have anything in your name... You can't put anything in your name."  CS-3 said "That's right. Because, you know what? They wanted to come, but I told them, No – no – no, I need to talk to her, I said. Uh-huh. They wanted to come meet you. Because the guys don't know anything here. Yeah."  VENTURA said "It scares me. What if he's a cop?"  CS-3 said "No, dude. No – no, because I have done business with them. When I came here from over there...we did a job, that's why they only charged me h-half. You know what I mean?"

36.     Later in the conversation, CS-3 asked "But I – I would bring it to you there in back, right?"  VENTURA replied "Uh-huh."  CS-3 asked "So there isn't – so there isn't a problem here, or what?"  VENTURA replied "Yeah, so it isn't seen." CS-3 said "Yeah – yeah – yeah, so no one sees the...the –."  VENTURA replied "Yes. Mm-hm."  CS-3 asked "What do you think?"  VENTURA replied "Look, uhm... Well, you tell me, Hey, I'm going to bring you a – a hamburger. Can you come out back?" CS-3 said "Right. But –"  VENTURA said "[OV] And you go buy some fries just so that it looks like...like I have – Because now they are recording everything [UI]." VENTURA said "No, but I trust you. I mean, I – I trust you, you know what I mean?"  CS-3 said "No – no – no, of course. No –" VENTURA said  "Uh-huh. Well, if you say yes, let's go for it."  CS-3 said "Yeah, it can be done. It's just – How do I say

this? Well, you would have to work it out with her, because I don't know what's going on with – when – when you were with that girl. With the – with the crazy girl." VENTURA aske "Uh-huh?" CS-3 said "With Isaura, I don't know how..." VENTURA replied "It's 60 for me." CS-3 asked "It's 60...dollars?"

37.    Affiant believes that in the above conversation, CS-3 asked VENTURA to help him send some drug proceeds to Mexico and they discussed the details. VENTURA told CS-3 the amounts she can send to certain areas of Mexico without raising suspicion. VENTURA then asked CS-3 if the drug dealers CS-3 is working with are trustworthy. CS-3 then asked if CS-3 should bring the drug money to the back door of the business and VENTURA said yes to put it in a food bag that a hamburger would be in because the video in the store would show CS-3 giving the money to VENTURA if he brought it in the front door. At the end of the conversation VENTRUA agrees to send the drug proceeds. CS-3 asked VENTURA what she charged GARCIA and VENTURA tells CS-3 that she would charge $60 per money order.

38.    On December 21, 2017, CS-3 at the direction of law enforcement, went to SUBJCET PREMISES 2 with $5,000 (given to CS-3 by law enforcement) of "drug proceeds" to give to VENTURA to wire to Mexico. This meeting was recorded and the conversation was in Spanish. This conversation has not yet been translated. CS-3 was also given several names (Blanca Agatha SANTOS, Guadalupe Irma MEJIA, Roberto Alfredo CORTEZ) to provide to VENTURA to use for the receiver names on the wire transfers. CS-3 did not provide VENTURA with sender

information. It should be noted that VENTURA directed CS-3 to come in the back entrance of Ventura Market with the money which CS-3 was observed doing.

39.     On December 23, 2017 and December 28, 2017 at the direction of law enforcement, CS-3 went to SUBJECT PREMISES 2 and picked up wire transfer receipts. These meetings were in Spanish and recorded. The below is a summary chart of the money transfers that VENTURA provided to CS-3 and the amount VENTURA charged for the wire transfers ($500.02).  Affiant believes that the $500.02 represented VENTURA's money laundering fee for falsifying sender information and splitting up money transfers in amounts less than $1,000 increments.

It should be noted that the receipts VENTURA gave to CS-3 had the portion of the receipt that lists "Novedades Ventura" cut off of the receipts.

40.     During the meeting between VENTURA and CS-3 on December 23, 2017, VENTURA had only completed 3 of the transactions.  This meeting was recorded and the conversation was in Spanish. VENTURA said "[UI] for them to collect it first so that – to know – to know how it's working, if – if they're going to be able to collect it. And if they don't collect them, well then we'll cancel them and there's no – there's no loss." CS-3 said "Okay, sure. [UI]." VENTURA said "[OV] Because if they can't collect them – Have them collect at Soriana and Elektra – Soriana or Elektra. If they can't collect them, I'll give you the five back." CS-3 replied "No, no problem. If – Look – look...let me see if they can collect it at – at Soriana, because I told them it's good in Soriana." VENTURA said  "Uh-huh, tell

him Elektra or Soriana. [UI]." CS-3 said "[OV] Yeah, because they had already given me five more, man." VENTURA replied "But yeah, I'll get them out for you today and tomorrow." CS-3 asked "You sure?" VENTURA replied "[OV] I mean, I'll get them out – Yes, but I need you to go and tell them to collect." CS-3 said "[OV] Yeah, because they are – they left me there..." VENTURA asked "What I don't want is to send it, and then they can't collect it, and then have to cancel it, I mean –" CS-3 said "[OV] Yeah." VENTURA said "You know what I mean? Because, for example, if you – if they collect it today and I do another one for you tomorrow, they'll say, "Well, it's a Christmas gift. That's fine." I mean, there's no problem. But if I do three and then I cancel it, I mean, how is it possible that nine transfers of the same amount from the same agency are being canceled?" CS-3 replied "Yeah, of course."

41.    Affiant believes that VENTURA only sent three transactions and wanted to ensure that CS-3's drug associates were able to collect the money in Mexico. VENTURA did not want to send any more and risk having to cancel them should there be a problem in collecting the money in Mexico. Having to cancel 3 transactions would be much less suspicious than having to cancel 9 transactions. At the end of the conversation, VENTURA told CS-3 she would do the other transfers soon. As reference in the above table in paragraph 42, law enforcement were able to confirm VENTURA completed the first 3 wire transactions on December 21, 2017 and the other 6 were completed after CS-3's meeting with VENTURA on December 21, 2017.

42.     On January 24, 2018, an undercover law enforcement officer (UC) went to SUBJECT PREMISES 2.  This meeting was recorded and the conversation was in Spanish. The UC approached VENTURA and told her that the UC wanted to wire transfer $3,160 to a relative in Guadalajara Mexico via MoneyGram. VENTURA asked for identification, which the UC provided to VENTURA. VENTURA told the UC that if the UC wanted to send $3,160 that the UC would have to send two separate wire transfers because there was a limit to how much money could be paid out in Mexico.  VENTURA went on to explain that most money remitters in Mexico will only pay out $2,500 or less. The UC then told VENTURA to only send $2,000.  VENTURA asked for the name of the UC's cousin and the UC gave VENTURA the name of Jorge FERNANDEZ-Soto.  VENTURA asked why the UC was sending so much money because usually people sending money to relatives wire much smaller amounts of money.  The UC told VENTURA that the UC's cousin asked for that amount and the UC did not know what his cousin needed the money for. VENTURA then did the wire transfer and the UC paid VENTURA a $41 for the transaction fee.  When the transaction was complete, VENTURA gave the UC a receipt that showed the name and address on the UC's identification as the sender name and address and the receiver names as Jorge FERNANDEZ-Soto. In addition, the receipt VENTURA gave to the UC did not have the portion of the receipt that listed  Novedades Ventura cut off.

43.     On February 6, 2018, the UC again went to SUBJECT PREMISES 2. This meeting was also recorded. The UC approached VENTURA and asked her if

she remembered the UC.  VENTURA said that she did.  The UC again asked VENTURA to send money to the UC's cousin. The UC told VENTURA that his/her cousin was angry that the UC had utilized the UC's name on the previous transaction and the cousin wanted the UC to use a different sender name. VENTURA told the UC that she could not do the transaction.  VENTURA explained that she has cameras with audio capability so she could not do the transaction. VENTURA said the police could review her video footage. VENTURA further explained that since the UC asked her to use a different sender name other than the UC's name, she could no longer conduct the transaction for the UC.  The UC told VENTURA that he could pay her for conducting the transaction.  VENTURA told the UC that she still would not do the transaction and that the UC would have to go to another store to conduct the transaction.

44.     Based upon the above facts and circumstances, your affiant believes sufficient probable cause exists to authorize a warrant for the arrest of VENTURA for violations of Title 18, United States Code, Section 1956(h), money laundering conspiracy.

_____
Michele M. Neily, Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me, this ____27____ day of February, 2018.

*By reliable electronic means.*

_____
Celeste F. Bremer
United States Magistrate Judge
Southern District of Iowa